IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THOMAS E. PRESTON, | CIVIL DIVISION |
| Plaintiff, | No. |
| v. | |
| FIDELITY BROKERAGE SERVICES, | |
| Defendant. | **JURY TRIAL DEMANDED** |

## COMPLAINT IN CIVIL ACTION

AND NOW, comes Plaintiff Thomas Preston, by and through counsel Robert A. Bracken, Esquire, Michael A. O'Leary, Esquire and the law firm of Archinaco/Bracken LLC, and files the following Complaint in Civil Action and avers as follows:

1. Plaintiff, Thomas E. Preston ("Preston"), is an adult individual and resident of the State of Pennsylvania with principal address of 225 Banbridge Drive, #3, Aliquippa, PA 15001.

2. Defendant, Fidelity Brokerage Services, LLC ("Fidelity"), is a long-term asset management business that provides financial planning and other financial services to both individuals and employers, with its corporate headquarters is located at 82 Devonshire Street, Boston, MA 02109.

3. Plaintiff brings this action under the Age Discrimination in Employment Act, 29 U.S.C. § 621, et seq., and the Pennsylvania Human Relations Act, 43 Pa. Stat. Ann. § 951, et seq., to secure full restitution of all lost wages and benefits resulting from Defendant's unlawful and wrongful conduct, and for such other relief as may be appropriate.

4. Defendant is an employer within the meaning of 29 U.S.C. § 630.

5. On August 25, 2016, Plaintiff filed a Charge of Discrimination alleging claims of age discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC"). *See* Exhibit 1.

6. This filings also constituted an initiation of proceedings with the Pennsylvania Human Relations Commission pursuant to and by operation of the work sharing agreement between the EEOC and that agency.

7. More than 60 days have passed since Plaintiff has filed his Charge of Discrimination. As such, Plaintiff commences this action pursuant to U.S.C. § 626(d)(1).

8. Plaintiff has complied with all conditions precedent to filing this Complaint.

9. The Court has jurisdiction over these claims pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 2617.

10. Venue is appropriate in this Court under 28 U.S.C. § 1391 because a substantial part of the events giving rise to this Complaint occurred in Bethel Park, Pennsylvania.

11. Indeed, Plaintiff's termination occurred within the Commonwealth of Pennsylvania and, more specifically, this District.

## FACTUAL ALLEGATIONS

12. In 2011, Preston was hired by Fidelity to work in their finance department as a financial consultant.

13. At the time of his hire, Preston had almost 25 years of experience in the financial industry working as a financial consultant/advisor.

14. Shortly after Preston began his employment with Fidelity, he was given a "book of business" which was basically an electronic database comprised of client accounts and/or client files.

15. In about 2014, Fidelity implemented a "temporary lockout" system whereby consultants who added value to a current or potential client relationship could enact a "lockout" on that client account in order to be compensated for adding value to the Fidelity-client relationship.

16. In order to "lockout" an account, a consultant simply had to make an entry in Fidelity's electronic client management system.

17. Since its implementation, Preston, along with other consultants at Fidelity, routinely (roughly once a week, in Preston's case) utilized the "temporary lockout" in order to be paid for the work that he performed on various client accounts.

18. Preston engaged in this practice many times without issue until April 14, 2016.

19. In the morning of April 14, 2016, two individuals who identified themselves as corporate investigators wanted to speak with Preston.

20. Preston, unaware as to why the investigators wanted to speak with him, agreed to speak with them in a conference room.

21. During the meeting, the investigators questioned Preston about some of the accounts that he had previously locked out in his book of business.

22. More specifically, the investigators discussed four clients with Preston and asked how he handled each of those cases. They showed Preston a few phone records and some excerpts of Preston's notes detailing his interactions with each of the four clients.

23. Preston repeatedly requested that he be given an opportunity to review the files in their entirety in order to try and recall the details of his interactions with those clients but was not permitted to do so.

24. When shown one account in particular, Preston recalled that a co-worker of his, Rich Grivas ("Grivas"), had previously locked out the account despite Preston doing most of the work for the client.

25. Preston further explained that he later spoke with that same client and when he asked the client if she had spoken with Grivas before, she said that she did not even know who Grivas was.

26. Preston also told the investigators that he told his manager, Matt Knight ("Knight"), about that particular account, explaining that he did all the work and should be the one getting the credit instead of Grivas, and Knight agreed with Preston and made the necessary adjustments so that Preston would get credit on the account.

27. In response, the investigators dismissively told Preston "this is about you and not anyone else."

28. At no point during the investigation was Preston permitted to review the client files in their entirety so that he could explain his acts of locking out the accounts in question.

29. Subsequent to the meeting, Preston was escorted out of the building and not permitted to collect any of his belongings. He was told to "take the rest of the day off."

30. That same day at about 3:00 p.m., Knight called him and informed him that he was being terminated but would not elaborate as to why. When Preston pressed further for an explanation, Knight again refused to provide one.

31. Shortly after receiving the termination phone call from Knight, Preston twice attempted to call Human Resources for an explanation about his termination but his calls went unreturned.

32. According to Preston, he stood to gain less than $1,000.00 from the four client files at issue.

33. As such, Fidelity terminated Preston, a man with over almost 30 years in the finance industry, over a sum of a less than $1,000.00.

34. At the time of his termination, Preston was 56 years old and was the oldest consultant at Fidelity.

35. Subsequent to his termination, Preston learned that Fidelity filled his job with a young man in his late 20s/early 30s. More specifically, the young man was transferred from Fidelity's Cleveland office and promoted to Preston's job in Pittsburgh.

36. Preston's termination was not based upon a violation of a uniformly enforced company policy but rather Fidelity's improper and discriminatory conduct.

37. Indeed, Fidelity had no interest in conducting a full and complete investigation, as they refused to provide Preston with the complete files in order to review them for accuracy and explain his side of the story nor did they inquire further about the information provided to them by Preston with respect to Grivas and Knight.

38. Subsequent to Preston's termination, Fidelity filed a defamatory Form U5.

39. Fidelity answered "Yes" to the following question: "Did the individual voluntarily resign from your firm, or was the individual discharged or permitted to resign from your firm, after allegations were made that accused the individual of: (1) violating investment-related statutes, regulations, rules or industry standards of conduct?

40. Preston did not violate any statute, regulation, rule or industry standard of conduct.

41. Further, Preston was not accused of violating any investment-related statute, regulation, rule or industry standard of conduct at the time of his termination.

42. Further, Fidelity stated the following in the Form U5: "FIRM DETERMINED EMPLOYEE VIOLATED DEPARTMENT PROCEDURES BY RECORDING A DETAILED CUSTOMER INTERACTION FOR PURPOSES OF PERFORMANCE CREDIT WITHOUT ACTUALLY HAVING HAD THE REQUISITE DEGREE OF INTERACTION WITH THE CUSTOMER."

43. These statement contained in Preston's U5 are false and Fidelity knew them to be false when made.

44. Fidelity's wrongful, discriminatory and defamatory conduct has caused Preston substantial harm and damaged his ability to obtain similar employment in the finance industry.

## COUNT I – AGE DISCRIMINATION

45. Plaintiff incorporates by reference herein Paragraphs 1 through 44 of the Complaint as if more fully set forth at length herein.

46. Defendant's conduct described above and herein constitutes age discrimination and is a violation of the ADEA.

47. Defendant's discriminatory conduct was used as a basis for employment decisions affecting Plaintiff.

48. The conduct described above and herein was unlawful age discrimination committed by Defendant's employees, servants and/or agents who had the effective ability to influence employment actions that could affect Plaintiff, including but not limited to firing.

49. As a direct and proximate result of Defendant's unlawful, willful, deliberate discrimination against Plaintiff, Plaintiff incurred substantial losses, continuing in their nature,

including but not limited to loss of wages and loss of benefits, harm to his reputation, adverse effects on his career and diminished earning capacity.

50. As a direct and proximate result of Defendant's unlawful, willful and deliberate discrimination against Plaintiff, Plaintiff is entitled to liquidated damages.

51. As a result of Defendant's discriminatory conduct, Plaintiff is entitled to all available damages pursuant to the ADEA, including but not limited to damages for the following: (1) economic and non-economic losses; (2) equitable relief including employment, reinstatement and promotion; (3) attorneys' fees and costs; (4) interest; and (5) liquidated damages.

WHEREFORE, for the foregoing reasons, Plaintiff respectfully requests judgment be rendered in his favor and against Defendant in an amount in excess of $75,000 with attorneys' fees and costs assessed, and any other relief or damages deemed proper by the Court.

## COUNT II – DEFAMATION

52. Preston re-alleges each of the averments contained in Paragraphs 1 through 51, inclusive, and incorporates said allegations as though fully set forth herein.

53. The statements contained in Preston's U5 are false and defamatory.

54. Defendant knew that the statements placed in Preston's U5 are false.

55. The statements in the U5 are the product of malice, a willful disregard for the truth and/or reckless indifference to the truth.

56. Alternatively, Defendant acted negligently with respect to the truth or falsity of the defamatory statements contained in Plaintiff's U5.

57. Further, Defendant has refused to correct the statements and/or mitigate the damage being caused to Preston.

58. The statements in the U5 were and are intended to mislead the reader into believing that Preston deliberately and intentionally misrepresented his job activity reporting and was accused of violating investment-related statutes, regulations, rules or industry standards of conduct.

59. The statements in the U5, by omitting exculpatory evidence, are also defamatory *per se* as they imply wrongdoing of an unspecified magnitude.

60. The statements in the U5 are defamatory *per se* as they are direct attacks on Preston's professional employment and business standing and blacken his reputation in the financial community, so severely that it has damaged his ability to obtain employment.

61. The statements in the U5 have and continue to cause Preston (and his reputation in the financial community) harm.

62. Defendant has persisted in its failure to correct the U5 so that Preston will be unable to work in the financial industry.

63. As a result of and/or caused by the defamation by Defendant, Preston has been substantially harmed, as his ability to obtain employment in the financial industry has been damaged.

64. As a result of the actions of Defendant, Preston has been substantially harmed, as his ability to obtain employment in the financial industry has been damaged.

65. Further, Respondent's conduct is intentional, outrageous, willful, wanton and reckless; thus, punitive damages are warranted.

66. Additionally, specific equitable relief is required as the language contained in the U5 must be stricken, expunged and/or reformed.

67. The language in the U5 must be expunged from the CRD and/or any other databases.

68. Without such relief, Preston has and will continue to be harmed and damaged by the actions of Fidelity on an ongoing basis.

69. This relief is needed immediately as the harm to Preston is ongoing and Preston will continue to be harmed and/or damaged by the incorrect, false and defamatory U5.

WHEREFORE, for the foregoing reasons, Plaintiff respectfully requests judgment be rendered in his favor and against Defendant in an amount in excess of $75,000 with attorneys' fees and costs assessed any other relief or damages deemed proper by the Court, including equitable and/or injunctive relief in the form of an expungement of Plaintiff's U5.

### COUNT III- PENDENT CLAIM - VIOLATIONS OF THE PENNSYLVANIA HUMAN RELATIONS ACT

70. Plaintiff incorporates by reference herein Paragraphs 1 through 69 of the Complaint as if more fully set forth at length herein.

71. Plaintiff brings this action under the Pennsylvania Human Relations Act, 43 P.S. § 951, et seq., to secure full restitution of all wages and benefits resulting from Defendant's violation of the provision of the Pennsylvania Human Relations Act and for such other and further relief as may be appropriate.

72. Jurisdiction of this action is based on the principles of supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

73. Defendant is an employer within the meaning of Section 954(b) of the Pennsylvania Human Relations Act.

74. Plaintiff's filings with the EEOC constituted an initiation of proceedings with the Pennsylvania Human Relations Commission pursuant to and by operation of the work sharing agreement between the EEOC and that agency.

75. As a direct and proximate result of Defendant's unlawful, willful, deliberate discrimination and retaliation against Plaintiff, Plaintiff incurred substantial losses, continuing in their nature, including but not limited to loss of wages and loss of benefits, harm to his reputation, adverse effects on his career and diminished earning capacity.

76. As a direct and proximate result of Defendant's unlawful, willful and deliberate discrimination and retaliation against Plaintiff, Plaintiff suffered from physical problems including emotional distress and anxiety.

77. As a result of Defendant's discriminatory and retaliatory conduct, Plaintiff is entitled to all available damages, including but not limited to damages for the following: (1) all available compensatory damages; (2) economic and non-economic losses; (3) equitable relief including employment, reinstatement and promotion; and (4) attorneys' fees and costs.

WHEREFORE, for the foregoing reasons, Plaintiff respectfully requests judgment be rendered in his favor and against Defendant in an amount in excess of $75,000 with attorneys' fees and costs assessed, and any other relief or damages deemed proper by the Court.

Date 12-2-16

ARCHINACO/BRACKEN, LLC

By _____
Jason A. Archinaco, Esq.
Robert A. Bracken, Esq.
Michael A. O'Leary, Esq.
The Pennsylvanian, Suite C-6
1100 Liberty Avenue
Pittsburgh, PA 15222
(412) 434-0555