# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

THOMAS E. PRESTON,      )
                      )
     Plaintiff,         )
                      )
        v.          )     **Civil No. 16-1799**
                      )
FIDELITY BROKERAGE SERVICES,  )
                      )
     Defendant.     )

## OPINION

Plaintiff, Thomas E. Preston, brings claims of age discrimination under the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq*. ("ADEA"), age discrimination under the Pennsylvania Human Relations Act, 43 Pa. Cons. Stat. § 951, *et seq.* ("PHRA"); and Defamation. His claims arise from allegations that Defendant, Fidelity Brokerage Services ("Fidelity"), engaged in a scheme to unlawfully terminate him because of his age by falsely accusing him of professional wrongdoing, and then publishing on a required industry form false defamatory statements as to why he was terminated.

Pending before the Court are Mr. Preston's Motion for Partial Summary Judgment as to Fidelity's ability to assert an absolute privilege defense to the Defamation claim, ECF No. 88,[1] and Fidelity's Motion for Summary Judgment as to all claims. ECF No. 93. As more fully explained below, Mr. Preston's Partial Motion for Summary Judgment will be denied, and Fidelity's Motion for Summary Judgment will be granted on all claims.

---

[1] Mr. Preston filed identical Motions for Partial Summary Judgement, ECF Nos. 86 & 88, and Briefs in Support, ECF Nos. 87 and 89. The Court will refer to ECF Nos. 88 and 89, because Mr. Preston's Concise Statement of Material Facts, ECF No. 90, and Appendix, ECF No. 92, refer to the motion filed at ECF No. 88. The Motion at ECF No. 86 will be dismissed as moot.

# I.  BACKGROUND[2]

Fidelity hired Mr. Preston in October 2011 as a Financial Consultant and he worked at the Pittsburgh, Pennsylvania investor center.  Mr. Preston reported to Matthew Knight, Vice President Branch Office Manager.  Mr. Knight reported to David Regelbrugge, Vice President Branch Office Manager and the territory supervisor of Fidelity's Pittsburgh branches.  As a Financial Consultant, Mr. Preston was subject to Fidelity's Temporary Lockout Policy, as set forth in Fidelity's "PI Investor Center, 2016 Rules of Engagement Rules of Relationship Policy Document" ("TLO Policy").  Mr. Preston was fired on April 14, 2016, for allegedly violating the TLO Policy.

The TLO Policy permits a Financial Consultant to "lock out" a customer, and receive exclusive financial remuneration for that customer, under certain defined circumstances.  The duration of a TLO is 180 days.  *Id.* at 2.  Fidelity's TLO Policy describes "Temporary Lockouts," as follows:

> The Temporary Lockout is designed to compensate registered representatives for providing professional services and appropriate investment solutions to both existing customers and prospects. By submitting a Temporary Lockout representatives acknowledge that they have addressed the needs of Fidelity's customers and/or prospects in a professional manner consistent with firm policy and industry standards. The Temporary Lockout process helps to insure (sic) that customers and/or prospects are properly educated about appropriate investments that are consistent with their financial needs.
>
> For these types of interactions, representatives are required to provide supporting notes in the Siebel system, to clarify or add commentary beyond that which the

---

[2]  The background facts set forth in the Opinion are undisputed unless otherwise indicated.  Additional facts may be discussed elsewhere in this Opinion, in context.  In determining the material facts in this case, all reasonable inferences are drawn in favor of the nonmoving party.  Inferences based upon speculation or conjecture, however, do not create a material factual dispute sufficient to defeat a motion for summary judgment.  Robertson v. Allied Signal, Inc., 914 F.2d 360, 382 n.12 (3d Cir. 1990).  The Court notes that throughout Plaintiff's summary judgment pleadings he asserts unsupported accusations that Fidelity witnesses lack credibility, baseless assertions attacking Fidelity's well-supported documentation, and inserts irrelevant assertions of alleged facts extraneous to the claims and defenses.

drop down box's in Siebel provide. By logging Temporary Lockouts into Siebel, representatives are creating a database of customer information, which can enhance a customer's future interactions with branch and/or phone representatives.

*Id.* The Seibel computer-based system for tracking notes is a part of Fidelity's books and records. Pursuant to the TLO Policy, a Financial Consultant is required to provide supporting notation in the Seibel system; specifically, the Policy states that "Seibel notes must be present and include documentation of a value add[ed] conversation." *Id.*

The TLO further describes Temporary Lockouts as "investment related conversations between Fidelity representatives and customers and prospects." *Id.* Such "discussions" are defined as one of the following four categories:

**A. Value Added Conversation** - Value added conversation consists of five clearly defined stages within the discussion between the Representative and the customer. They include, understanding the investor goal, knowing the opportunity, discussing a potential solution, outlining the next steps, and documenting additional customer specific information as may be required by the nature of the conversation.

**B. Full Guidance** - Those conversations involving portfolio planning through the use of a recognized Fidelity guidance interaction; tool based or dialogue based such as 'fundamental guidance'. The conversation can be done in person or over the phone. The following tool based suite includes: Retirement Quick Check, Portfolio Review, Retirement Income Planner, PAS IPQ, FILI IPQ, Fundamental Guidance, PRQP and the Annuity Calculator.

**C. Completion of a New Account or Transfer Form** - Representative directly assists customer in completing a new account or asset transfer form including letters of instruction (DTC, Corporate Rollover Paperwork, etc...). This can be done in person or over the phone.

**D. Active Trader Discussion** - Discussion of Fidelity Active Trader Services with the following customer conditions present and documented in Siebel:
   a. Customer trades at least 120 times a year (includes Fidelity and outside trading)
   b. Has outside assets to bring to Fidelity to use for trading
   c. Wants to discuss Fidelity's trading advantage and expects a call from an expert.

3

*Id.* at 2-3. Fidelity asserts that the above four categories are the only methods by which a Financial Consultant may claim a temporary lockout. Mr. Preston disputes Fidelity's assertion, claiming that the TLO Policy provides eight other ways in which a Financial Consultant may claim a TLO. Mr. Preston points to the TLO Policy's "Additional Guidelines for Temporary Lockouts," which provide that "Branch FCs may use Temporary lockout when:

- Client is eligible for the 1:1 relationship
- Client is an external referral with <$250K PI assets
- Client is better suited for ATS, AT VIP, a PAS FC, or Premium Service
- Clients >$500K PI assets must be offered a <u>covered</u> model: Book, ATS/AT VIP, PAS FC
- Clients <$500K PI assets reps have discretion to use temp lockout and <u>not</u> offer a 1:1 relationship position the model the client is best suited for: ATS, PAS FC, or Premium Services
- The client declines coverage
- Stand-alone Niche (non-proto, corporate accounts) with BOM approval; requires Market manager approval to renew; guidce for current AT VIP, ATS or SPS customer (BAU)
- A limit of one temp lockout per customer, unless granted a **manager exception** (must be documented in Siebel)

TLO Policy, at 3.

Mr. Preston was terminated following an investigation into alleged improper use of TLO's by Financial Consultants in Pittsburgh. In February 2016, an anonymous Fidelity employee reported a complaint to Cathy Morrisey, Director of Fidelity's Employee Relations. The complaint raised concerns that Financial Consultants in Pittsburgh were abusing the TLO system by locking out customers without having the requisite customer interaction. After receiving the complaint, Ms. Morrisey conferred with Fidelity's in-house counsel and another Fidelity employee, after which they agreed that the complaint needed to be investigated. Fidelity assigned Internal Investigators Matthew Pliskin and Eric Bronner to conduct the investigation.

4

The investigators reviewed TLO activity for all seven of Fidelity's Pittsburgh Financial Consultants. The investigators decided not to review TLO activity for Vice President Financial Consultants, since the complaint only referred to Financial Consultants. The investigation began by reviewing a sample of sixty-two out of a total of 135 TLO's processed by the seven Pittsburgh Financial Consultants during the prior four months. The investigators cross-referenced each TLO with the Financial Consultant's associated Seibel note. The investigators reviewed telephone logs associated with each TLO, which, in part, showed the length of the telephone call. The investigators also consulted usage reports to confirm when a Financial Consultant accessed each customer's account information.

The initial phase of the investigation revealed that Mr. Preston had thirty-five TLO's during the investigation time period. The investigation identified three suspect lockouts for Mr. Preston. The length of the customer telephone calls appeared to be too brief to qualify as "value added conversations." And, for one of the three TLO's, there was no telephone or other record that showed any communication with the customer. No other Financial Consultants' TLO's raised similar concerns. The investigators next reviewed Mr. Preston's overall TLO activity. During this phase of the investigation, seven of Mr. Preston's TLO's did not appear to be supported with documented appropriate customer interaction in accordance with Fidelity's TLO Policy.

Central to the instant action is a single, December 24, 2015, Preston TLO for a customer identified as Customer A. On December 21, 2015, the telephone log showed that Mr. Preston had a 54-second call to Customer A's telephone number. Mr. Preston entered a Seibel note associated with this call indicating that he had left a message with the customer. On December 22, 2015, the telephone log showed that Mr. Preston had a six-second call to Customer A's

telephone number, after which he again noted in the Seibel system that he had left a message with the customer. On December 24, 2015, the telephone log indicates that Mr. Preston had another six- second call with Customer A. Mr. Preston initiated a TLO for Customer A on December 24, 2015, which was the last business day for the compensation year. Mr. Preston's Seibel note, associated with the December 24, 2015 six-second call, stated: "Called to introduce myself to him as local point of contact for him. Sending my contact information. Will use if needed. Confirmed that TOA is in progress towards completion, saw note that fee adjustment was made."

On April 14, 2016, the investigators interviewed Mr. Preston. Internal Investigations Investigative Summary, at 3 (Ex. I (under seal)). During the interview Mr. Preston indicated that he understood the requirement that a Financial Consultant must have a value-added conversation with a customer before applying a TLO. *Id.* The investigators then questioned Mr. Preston about specific TLOs. They showed him the timelines they had developed for each customer, permitted Mr. Preston to read through them, and then asked him to explain each TLO. Specifically, the investigators asked Mr. Preston if he had talked to Customer A. *Id.* The investigators reported that Mr. Preston "admitted that he never had a conversation with [Customer A] and that the TLO was a policy violation." *Id.* The investigators asked Mr. Preston why he took the TLO on Customer A, and Mr. Preston responded, "that he listened to the 'voice on his shoulder,' something that he typically does not do." *Id.*; Pliskin Dep. 64.

During the litigation, Mr. Preston has disputed the assertion that he admitted that he did not have a conversation with Customer A. Preston Dep. 101-102, 106. He admits he used the phrase, "voice on his shoulder," but it was not said in connection to Customer A; rather, he used that phrase when discussing his background with the investigators. Preston Dep. 104. He

maintains that he told the investigators that he did have a conversation with Customer A. Mr. Preston testified that immediately after he called Customer A and left a message, Customer A returned his call and Mr. Preston proceeded to have a conversation with him. He summarized the phone call as follows:

> [Customer A] said he saw the call come in; [I] said I was trying to reach out to him; wanted to introduce myself. He said he - - you know, that I would help him, shepherd him through the process. He said, you know, if I need you I'll certainly get back in touch with you. He asked me to send out my point of contact, so I mailed him a business card. And that was – that was it.

Preston Dep. 120-21. Mr. Preston stated that the Seibel note he entered connected to the TLO on Customer A and the six-second "Phone Call Out" to Customer A was mistakenly marked as "Phone Call Out." Preston Dep. 118. He stated that he should have marked it as a "Phone Call In." Preston Dep. 118. If there was a "Phone Call In" from Customer A, it should have appeared on the telephone logs so that a Seibel note could be associated with it. However, the investigation did not show a "Phone Call In" from Customer A on December 24, 2015. The investigators took handwritten notes during the investigation, then typed the notes into the computer, and discarded the notes. Mr. Preston maintains that the original handwritten notes would have revealed his version of events.

After the interview, and on the same date, April 14, 2016, the investigators briefed Mr. Regelbrugge, as well as Fidelity's representatives from its Legal, Employee Relations, and Compliance departments. Internal Investigations Investigative Summary, at 3-4. The investigators told Mr. Regelbrugge that Mr. Preston "admitted to knowingly violating the policy in regard to the [Customer A] TLO and that he knew the violation would result in his benefit." *Id.* at 3. The Investigators also told Mr. Regelbrugge that Mr. Preston stated that he had listened to the voice on his shoulder, which was something he typically did not do. *Id.* Based on

information provided by the investigators, Mr. Regelbrugge determined that Mr. Preston had falsified books and records and thereby manipulated the compensation plan to benefit himself monetarily. As a result and based solely on the information provided by the investigators, Mr. Regelbrugge decided to terminate Mr. Preston's employment with Fidelity. At that time, Mr. Regelbrugge was not aware of Mr. Preston's age.

Following Mr. Preston's termination, Fidelity submitted the required Form U5 to the Financial Industry Regulatory Authority (FINRA). FINRA is an "association of brokers and dealers registered as a national securities association pursuant to subsection (b)" of 15 U.S.C. § 78o-3. The rules of FINRA "are designed to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade, . . . and, in general, to protect investors and the public interest." 15 U.S.C. § 78o-3(b). FINRA requires member firms to complete a Form U5 within thirty days of termination of a registered representative. The employer must file the U5 in FINRA's Central Registration Depository. The U5 is only accessible to FINRA member firms. FINRA also operates a free and public online database tool called BrokerCheck that also stores the reason for a registered representative's termination. Said information can be publicly accessed online.

On May 11, 2016, pursuant to its obligations as a FINRA member firm, Fidelity submitted a Uniform Termination Notice for Securities Industry Registrations ("Form U5") in connection with Mr. Preston's termination. Mr. Knight signed the Form U5. On the Form U5, in response to the question, "is this a full termination? Fidelity selected "Yes" and noted the "reason for termination" as "Discharged." If the reason for termination is "Discharged," the reporting firm is required to provide an explanation on the Form U5. Fidelity's Form U5 explanation stated: "Firm determined employee violated department procedures by recording a

detailed customer interaction for purposes of performance credit without actually having had the requisite degree of interaction with the customer." In addition, Question 7F(1) on Form U5 asks, "Did the individual voluntarily resign from your firm, or was the individual discharged or permitted to resign from your firm, after allegations were made that accused the individual of: 1. Violating investment-related statutes, regulations, rules or industry standards of conduct.?" Fidelity answered Question 7F(1), "Yes." As explanation for its response to Question 7F(1), Fidelity stated, "Allegation that employee violated department procedures by recording a detailed customer interaction for purposes of performance credit without actually having had the requisite degree of interaction with the customer."

## II.  STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56, summary judgment is appropriate where the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a). The court must enter summary judgment against a party who fails to make a showing sufficient to establish an element essential to his or her case, and on which he or she will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In evaluating the evidence, the court must interpret the facts in the light most favorable to the nonmoving party, drawing all reasonable inferences in his or her favor. *Watson v. Abington Twp.*, 578 F.3d 144, 147 (3d Cir. 2007).

In ruling on a motion for summary judgment, the court's function is not to weigh the evidence, make credibility determinations, or determine the truth of the matter; rather, its function is to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000) (citing decisions); *Anderson v. Liberty Lobby*, 477 U.S. 242, 248–49 (1986);

*Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 643 n. 3 (3d Cir. 1998). The mere

existence of a factual dispute, however, will not necessarily defeat a motion for summary

judgment. Only a dispute over a material fact—that is, a fact that would affect the outcome of

the suit under the governing substantive law—will preclude the entry of summary judgment.

*Liberty Lobby*, 477 U.S. at 248. A dispute is "genuine" if the evidence is such that a reasonable

trier of fact could render a finding in favor of the nonmoving party. *McGreevy v. Stroup*, 413

F.3d 359, 363 (3d Cir. 2005).

Where the nonmoving party will bear the burden of proof at trial, the moving party may

meet its burden by showing that the admissible evidence contained in the record would be

insufficient to carry the nonmoving party's burden of proof or that there is an absence of

evidence to support the nonmoving party's case. *Celotex Corp.*, 477 U.S. at 322, 325; *Marten v.

Godwin*, 499 F.3d 290, 295 (3d Cir. 2007). If the movant meets his or her burden, the burden

shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for

trial" and to present sufficient evidence demonstrating that there is indeed a genuine and material

factual dispute for a jury to decide. Fed. R. Civ. P. 56(e); *see Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 247-48 (1986); *Celotex*, 477 U.S. at 323-25. The nonmoving party must go

beyond his or her pleadings and designate specific facts using affidavits, depositions, admissions

or answers to interrogatories showing that there is a genuine issue of material fact for trial.

*Celotex*, 477 U.S. at 324. The nonmoving party cannot defeat a well-supported motion for

summary judgment by simply reasserting unsupported factual allegations contained in his or her

pleadings. *Williams v. Borough of West Chester*, 891 F.2d 458, 260 (3d Cir. 1989). Furthermore,

"[w]hen opposing summary judgment, the non-movant may not rest upon mere allegations, but

rather must 'identify those facts of record which would contradict the facts identified by the

movant.'" *Corliss v. Varner*, 247 F. App'x 353, 354 (3d Cir. 2007) (quoting *Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 233 (3d Cir. 2002)). Inferences based upon speculation or conjecture do not create a material factual dispute sufficient to defeat a motion for summary judgment. *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n.12 (3d Cir. 1990).

## III. DISCUSSION

### A. ADEA and PHRA Age Discrimination Claims

Mr. Preston claims that Fidelity discriminated against him based on his age in terminating him. Fidelity moves for Summary Judgment in its favor on said Age Discrimination claims. The same legal standards and analyses are used for both ADEA and PHRA claims. *See Kautz v. Met Pro Corp.*, 412 F.3d 463, 465 (3d Cir. 2005). Under the ADEA, "[i]t shall be unlawful for an employer (1) ... to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). Where the plaintiff presents no direct evidence of age discrimination, such as in this case, the claim must be analyzed under the burden shifting framework provided by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). The *McDonnell Douglas* analysis requires: "first, that the plaintiff establish a prima facie case of employment discrimination; second, that the employer proffer a nondiscriminatory reason for its adverse employment action; and third, that the plaintiff must then show that the employer's proffered explanations were pretextual." *Williams v. Shenango, Inc.*, 986 F. Supp. 309, 318 (W.D. Pa. 1997) (citing *Sheridan v. E.I. DuPont de Nemours and Co.*, 100 F.3d 1061, 1065–67 (3d Cir.1996) and *McDonnell Douglas*, 411 U.S. 792). To establish a prima facie case of age discrimination, Mr. Preston must show that he or she:

(1) was a member of the protected class, *i.e.*, was over 40, (2) was qualified for the position, (3) suffered an adverse employment decision, and (4) ultimately was replaced by a person sufficiently younger to permit an inference of age discrimination.

*Monaco v. American General Assurance Company,* 359 F.3d 296, 300-301 (3d Cir.2004). For purposes of Fidelity's Motion for Summary Judgment the Court presumes that Mr. Preston has established a prima facie case of age discrimination.[3]

Once a plaintiff sets forth a prima facie case, the defendant has the burden of coming forward with a legitimate, non-discriminatory reason for the adverse employment decision. *Goosby v. Johnson & Johnson Medical, Inc.*, 228 F.3d 313, 319 (3d Cir. 2000). This burden is "relatively light," and the employer need only "introduc[e] evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir.1994). "If the employer is able to proffer a legitimate non-discriminatory reason for its actions, the plaintiff must demonstrate that the proffered reason was merely a pretext for unlawful discrimination." *Id.*

Fidelity proffers Mr. Preston's misconduct as its legitimate, non-discriminatory reason for his termination. Upon review of the investigation results, as presented in the background section above, the internal investigation resulted in Fidelity's Vice President Branch Office Manager, Mr. Regelbrugge's decision to terminate Mr. Preston's employment because he had violated the firm's TLO Policy and industry rules prohibiting falsifying books and records.

---

[3] In its initial brief, Fidelity argued that Mr. Preston cannot show that he was qualified for his position because he was terminated for violating firm policy. Mr. Preston responded by arguing that the question of whether a plaintiff is qualified at the prima facie case stage requires a consideration of his education and experience at the time he held the job, and that an employer may not bootstrap its own termination of plaintiff to defeat a prima facie case. Without conceding its position, Fidelity abandoned pursuit of this argument in later briefing, and at oral argument, focused only on Mr. Preston's inability to show that its termination decision was pretextual.

Thus, Fidelity has met its relatively light burden of showing a legitimate, nondiscriminatory reason for the termination.[4]

Mr. Preston has the burden of persuasion to discredit Fidelity's proffered reason for termination. *Mil v. Avdel Corp.*, 873 F.2d 701, 706 (3d Cir. 1989). "In order to survive a motion for summary judgment in a pretext case, the plaintiff must now produce 'sufficient evidence to raise a genuine issue of fact as to whether the employer's proffered reasons were not its true reasons for the challenged employment action.'" *Krouse v. American Sterilizer Co.,* 126 F.3d 494, 504 (3d Cir.1997) (citing *Sheridan v. E.I. DuPont de Nemours and Co.,* 100 F.3d 1061, 1067 (3d Cir.1996) (*en banc*). To create a genuine issue of material fact, Mr. Preston must "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes,* 32 F.3d at 764.

As to the first prong, to "'discredit the employer's proffered reason . . . the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent.'" *Keller v. Orix Credit Alliance, Inc.,* 130 F.3d 1101, 1108–09 (3d Cir.1997) (quoting *Fuentes,* 32 F.3d at 765). "Rather, the nonmoving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or

---

[4] *See Hood v. Citizens Bank of Pennsylvania a subsidiary or Div. of Citizens Fin. Grp., Inc.,* No. CV 14-867, 2016 WL 3746366, at *5 (W.D. Pa. May 24, 2016) (violation of Bank's policy requiring employees to validate a customer's identity and policy to not enter false information into the bank system satisfies defendant's burden to articulate a legitimate nondiscriminatory reason for termination), report and recommendation adopted sub nom. Hood v. Citizens Bank of Pennsylvania, No. 2:14CV867, 2016 WL 3766433 (W.D. Pa. July 8, 2016), aff'd, 694 F. App'x 80 (3d Cir. 2017) (affirmed *Hood v. Citizens Bank of Pennsylvania,* 694 F. App'x 80 (3d Cir. 2017)); *Pederzolli v. Sonneborn, Inc.,* No. CIV.A. 13-438, 2014 WL 6953119, at *9 (W.D. Pa. Dec. 8, 2014).

contradictions in the employer's proffered reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence." *Fuentes,* 32 F.3d at 765. "The question is not whether the employer made the best, or even a sound, business decision; it is whether the real reason is [discrimination]." *Keller,* 130 F.3d at 1109. "In simpler terms, [the plaintiff] must show, not merely that the employer's proffered reason was wrong, but that it was so plainly wrong that it cannot have been the employer's real reason." *Id.* Mr. Preston submits three arguments in support of pretext under the first prong. (1) His TLO was proper under his version of his encounter with Customer A; (2) "Additional Guidelines" in the TLO Policy support his TLO; and (3) various assertions of improper investigation and decisions by Fidelity.

To meet his burden Plaintiff argues that a factfinder could reasonably disbelieve Fidelity's reason for termination because there is evidence that Mr. Preston did not violate the TLO Policy. Mr. Preston argues that his TLO was proper under his version of his interaction with Customer A. Mr. Preston argues that, according to his version, a factfinder could disbelieve Fidelity's articulated legitimate reasons for terminating him. The TLO Policy defines a "value added conversation" as consisting of

> five clearly defined stages within the discussion between the Representative and the customer. They include, understanding the investor goal, knowing the opportunity, discussing a potential solution, outlining the next steps, and documenting additional customer specific information as may be required by the nature of the conversation.

TLO Policy, at 2-3. Mr. Preston admitted in his deposition that he understood Fidelity's TLO Policy. Preston Dep. 61. He demonstrated his understanding by testifying that a "value added conversation," means that the Financial Consultant had "to bring something to the table for the client of value," "something of substance, something that they're not getting anywhere else. Preston Dep. 63, 67, 68. Mr. Preston's own version of his December 24, 2015 conversation, and

his report of its content does not satisfy the TLO Policy requirement for a value-added conversation. The content of such conversation, as Mr. Preston related, does not meet the Policy definition of an "investment related conversation" or a "value added conversation." As such, Mr. Regelbrugge reached a reasonable conclusion that Mr. Preston violated the TLO Policy by placing a temporary lockout on Customer A. Therefore, even if Mr. Preston's version of events is accepted as true, Mr. Regelbrugge's decision to terminate Mr. Preston for violating Fidelity's TLO Policy by placing a lockout on a customer without having the requisite customer interaction would remain valid. Even if Mr. Regelbrugge's conclusion was based on the investigators report and not on Mr. Preston's version of his interaction with Customer A, it is not enough for Mr. Preston to show that Fidelity's decision was mistaken, as "the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Fuentes,* 32 F.3d at 765. There is no evidence to suggest age discrimination was in any way a motivating factor in Mr. Preston's termination.

Next, Mr. Preston argues that the TLO Policy allowed for other methods to apply a TLO that the investigators did not consider. Mr. Preston argues that a Financial Consultant may claim a temporary lockout, separate and apart from engaging in a qualifying interaction for a lockout under one of the four categories listed under the Policy's "Temporary Lockout Requirements." Mr. Preston relies on the TLO Policy's eight "Additional Guidelines for Temporary Lockouts." TLO Policy, at 3. Mr. Preston's position is not supported by the TLO Policy. The terms of the TLO Policy clearly define "Temporary Lockouts" as *investment related conversations* between Fidelity representatives and customers and prospects," and that such "discussions fall into" only four categories; the one at issue in this case being "A. "Value Added Conversation." Mr. Preston cannot show that he had the requisite *investment related conversations* between [himself] and a

15

customer] [or] prospect." Because he cannot show that he met the initial requirement of an investment related conversation, the analysis does not reach the Additional Guideline criteria. The eight purported additional guidelines are not independent from the TLO Policy requirement that a Financial Consultant must have "an investment related conversation" with a customer that falls into one of the four categories. The category at issue in Mr. Preston's claim for a TLO is a value added conversation with Customer A on December 24, 2015. Mr. Preston's evidence does not establish any question of a value added conversation with Customer A on December 24, 2015. Thus, his argument fails to show pretext for age discrimination.

Mr. Preston also presents several other unsupported arguments. He attacks the investigation in general, zeroing in on the investigators' alleged multiple investigation failures, Fidelity's improper interpretation of the TLO Policy, and the investigators' alleged nefarious destruction of notes. The investigators took handwritten notes during their investigation. Within days of taking such notes, and before any litigation was anticipated, the investigators typed their handwritten notes and discarded them. Mr. Preston relies heavily on this alleged improper conduct, but he offers no evidence to show the investigators' bad faith, or otherwise support his allegations. Mr. Preston also alleges, with no evidentiary support, that Fidelity and Mr. Preston were engaged in a "compensation dispute" that was not related to the TLO Policy and Form U5 reporting requirements. None of these unsupported and speculative arguments relate to any evidence of age discrimination on the part of anyone at Fidelity, nor do they provide a factfinder with competent evidence on which the factfinder could disbelieve Fidelity's legitimate non-discriminatory reason for terminating Mr. Preston.

As to the second prong, the plaintiff must "identify evidence in the summary judgment record that 'allows the factfinder to infer that discrimination was more likely than not a

16

motivating or determinative cause of the adverse employment action.'" *Keller,* 130 F.3d at 1111

(quoting *Fuentes,* 32 F.3d at 762). "In other words, under this prong, [the plaintiff] must point to

evidence that proves . . . discrimination in the same way that critical facts are generally proved—

based solely on the natural probative force of the evidence." *Id.* "'For example, the plaintiff

may show that the employer has previously discriminated against [the plaintiff], that the

employer has previously discriminated against other persons within the plaintiff's protected class,

or that the employer has treated more favorably similarly situated persons not within the

protected class.'" *Jones, v. School District of Phila.,* 198 F.3d 403, 413 (3d Cir. 1999)

(quoting *Simpson v. Kay Jewelers, Division of Sterling, Inc.,* 142 F.3d 639, 645 (3d Cir. 1998)).

Under this second prong, in an effort to meet his burden to establish pretext, Mr. Preston

presents a variety of arguments. He argues that two younger Fidelity employees, Mr. Knight

(Mr. Preston's supervisor), and Rich Grivas (a Vice President Financial Consultant), were treated

more favorably because they were not investigated. These individuals are not proper

comparators, because the investigation responded to an anonymous complaint about Pittsburgh

"Financial Consultants." Neither Mr. Knight nor Mr. Grivas were Financial Consultants; thus,

Fidelity made the reasonable business decision to limit its investigation to the Pittsburgh

Financial Consultants. Additionally, there is no evidence demonstrating that either Mr. Knight

or Mr. Grivas engaged in any improper conduct with TLOs to warrant an investigation into their

activity. Thus, there is no merit to Mr. Preston's assertion of pretext in this regard.

Mr. Preston also relies on evidence from five Form U5s submitted by Fidelity to FINRA.

Of the five U5s, two concerned employees over the age of 40, Mr. Preston's and another

employee. For Mr. Preston, Fidelity answered "Yes" to Question 7F(1); but, for the other

over-40 employee, Fidelity did not answer yes to Question 7F(1). This evidence shows only that Fidelity did not treat persons in a certain class - over the age of 40 - in a discriminatory manner, and therefore it does not establish any question that Fidelity's proffered reason for termination was a pretext for age discrimination.

Next, Mr. Preston argues that although Mr. Regelbrugge did not harbor a discriminatory motive in making the decision to terminate him, a biased employee in the chain of events caused Mr. Regelbrugge to complete the discriminatory termination action. *See Root v. Keystone Helicopter Corp.*, 2011 WL 144925, *6 (E.D. Pa. Jan. 18, 2011). Mr. Preston does not offer any evidence to identify anyone who arguably harbored any age-related discriminatory animus towards him, or towards other employees. Therefore, Mr. Preston's argument of pretext in this regard fails.

Mr. Preston also generally accuses "Fidelity" of harboring an anti-age bias; but, he offers no evidence that age was a factor in his termination. Preston Dep. 95, 98, 157-158, 161. He presents no evidence that the investigators discriminated against him because of his age. Preston Dep. 158. He presents no evidence that Mr. Regelbrugge, or Mr. Regelbrugge's supervisor, Cheryl Wilson, discriminated against him based on his age. Preston Dep. 158. Mr. Preston also never heard Mr. Knight, or any other Fidelity manager or supervisor, make any age-related comments, and he does not know that age was the determining factor in the termination. Preston Dep. 95, 161. As such, the record contains no direct or indirect evidence to support any age discrimination. Thus, Mr. Preston's claim fails.

Fidelity is entitled to Summary Judgment as a matter of law on Mr. Preston's ADEA and PHRA Age Discrimination claims, as Mr. Preston is unable to show that Fidelity's legitimate nondiscriminatory reason for terminating him was a pretext for age discrimination. Fidelity's

18

Motion for Summary Judgment will be granted as to Mr. Preston's Age Discrimination claims, Count I (ADEA) and Count III (PHRA). Accordingly, judgment on Mr. Preston's Age Discrimination claims will be entered in favor of Fidelity and against Mr. Preston.

### B. Defamation

Fidelity and Mr. Preston have each filed a motion for summary judgment on the issue of defamation. Each raises the question of whether Fidelity's statements on the FINRA Form U5 are subject to an absolute or conditional privilege defense.[5] Mr. Preston seeks a ruling that, as a matter of Pennsylvania law, an absolute privilege defense is not available to Fidelity. He also argues that, although Fidelity may be entitled to a conditional privilege defense, such privilege may be defeated by a showing of negligence or malice, and that such issue is a question for the jury. Fidelity seeks judgment as a matter of law on Mr. Preston's Defamation claim arguing that the evidence demonstrates that the statements on the Form U5 were privileged, regardless of whether an absolute or conditional privilege applies.

Under Pennsylvania law, as set forth in 42 Pa. Cons. Stat. § 8343(a), a claim for defamation requires that the plaintiff prove, when properly raised, the following elements:

(1) The defamatory character of the communication.
(2) Its publication by the defendant.
(3) Its application to the plaintiff.
(4) The understanding by the recipient of its defamatory meaning.
(5) The understanding by the recipient of it as intended to be applied to the plaintiff.
(6) Special harm resulting to the plaintiff from its publication.
(7) Abuse of a conditionally privileged occasion.

---

[5] Counsel for Mr. Preston has filed a Notice of Motion, ECF No. 124, regarding a forthcoming motion for reconsideration to be filed in an unrelated action. The motion for reconsideration is addressing the case of *Gilson v. PA. State Police,* 175 F. Supp. 3d 528 (W.D. Pa. 2016), a case cited by Fidelity, but not relied upon by the Court in the present action.

42 Pa. Cons. Stat. § 8343(a). The defendant has the burden of proving, when properly raised, that the statements were privileged. 42 Pa. Cons. Stat. § 8343(b)(2).

Fidelity argues as a matter of law that an absolute privilege should apply to statements made on a Form U5. In support, Fidelity cites a decision from the Court of Common Pleas of Philadelphia County, *Merkam v. Wachovia Corp.*, Court No. 2397, 2008 WL 2214649, at *6 (Pa.Com.Pl. Apr. 08, 2008). The *Merkam* Court, relying on New York Court state decisions, concluded that statements made on a Form U5 "should receive the full protection of absolute privilege . . . as the Form U-5 was required to be filed with the NASD [predecessor to FINRA]." *Merkam*, 2008 WL 2214649, at *6. According to the *Merkam* Court, the "rationale behind [the New York State] decisions is a policy that promotes an unimpeded flow of information from brokerage firms to the NASD, allowing the reporting of unethical behavior in the securities industry without the threat of defamation or other tort claims." *Merkam*, 2008 WL 2214649, at *6. Fidelity thus submits the Court of Appeals of New York's decision in *Rosenberg v. MetLife, Inc.*, 866 N.E.2d 439 (2007) to support its argument that an absolute privilege should apply. The *Rosenberg* Court held, "Statements made by an employer on a [FINRA] employee termination notice are subject to an absolute privilege in a suit for defamation." *Rosenberg*, 866 N.E.2d at 445. In reaching this conclusion, the *Rosenberg* Court noted that FINRA's investigation of misconduct received through a Form U5 "ultimately inure[s] to the benefit of the general investing public, which faces the potential for substantial harm if exposed to unethical brokers." *Id.* at 444. The Court explained that the "Form U–5's compulsory nature and its role in [FINRA's] quasi-judicial process, together with the protection of public interests, lead us to conclude that statements made by an employer on the form should be subject to an absolute

20

privilege." *Id.* Fidelity argues that the *Rosenberg* Court's reason should be adopted by this Court.

Mr. Preston argues that application of an absolute privilege to responses on FINRA Form U5 in defamation cases is an extreme minority view. Mr. Preston argues that the Pennsylvania Constitution protects an individual's right to reputation,[6] and that pursuant to defamation case law in Pennsylvania, Pennsylvania would not apply absolute privilege to FINRA U5 disclosures. He further argues that Pennsylvania case law supports the majority view of affording conditional privilege for FINRA U5 disclosures.

In the circumstances of conditional privilege, said privilege can be defeated. The parties differ in regard to whether malice or negligence is required to overcome a conditional privilege in a U5 defamation case. Mr. Preston argues that Pennsylvania would permit negligence to overcome the conditional privilege in this case. In general, in Pennsylvania, for a private figure defamation plaintiff to establish a defamation claim, the plaintiff must prove that the defamatory matter was negligently published to overcome defendant's conditional privilege. *Menkowitz v. Peerless Publications, Inc.*, 211 A.3d 797, 806 (Pa. 2019) (quoting *Amer. Future Sys., Inc. v. Better Bus. Bureau of E. Pa.*, 923 A.2d 389, 400 (Pa. 2007)). Fidelity concedes that Mr. Preston is a private figure[7] for purposes of general conditional privilege analysis. However, Fidelity argues that, where the defamatory statements are made on the required FINRA Form U5,

---

[6] The Pennsylvania Constitution provides in relevant part as follows:

> All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness.

Pa. Const. art. I, §1.

[7] *See* Def. Resp. Opp. at 22.

Pennsylvania would require plaintiff to demonstrate malice in order to overcome the conditional privilege. Mr. Preston and Fidelity agree that a showing of malice to defeat conditional privilege for a FINRA U5 disclosure is the majority view. *See* Pltf. Sur-Reply in Opp. 3 (Recognizing that "Pennsylvania would stand alone as being the only state that required only proof of negligence to defeat the conditional privilege"). Nonetheless, Mr. Preston argues that, because Pennsylvania's Constitution protects one's right to reputation, and in conjunction with relevant Pennsylvania case law, he only needs to show negligence to overcome the conditional privilege this case.

Presently, the evidence in this case demonstrates that from the time when a Fidelity employee made the anonymous complaint until Fidelity published the Form U5, Fidelity adhered to a course of action that was reasonable and methodical. As explained above, there is no evidence that any Fidelity employee harbored any general anti-age bias or acted with specific discriminatory bias against Mr. Preston. The initial anonymous complaint was reviewed by three employees, including Fidelity's in-house legal counsel. The investigators began with a review of all Pittsburgh-based Financial Consultants TLOs over a defined period of time. The investigation zeroed in on Mr. Preston because of questionable evidence and records. An interview with Mr. Preston resulted in a report to Fidelity supervisor, Mr. Regelbrugge. Fidelity ultimately determined that Mr. Preston violated the TLO Policy by falsely reporting that he had a detailed customer interaction when he did not and that he manipulated the compensation plan to benefit himself monetarily. Mr. Preston was then terminated.

. The evidence shows that Mr. Preston made a six-second outgoing call to Customer A. Mr. Preston admits that the information he noted in Seibel when he applied a TLO to Customer A did not concern that outgoing phone call. Instead he claims that his Seibel note refers to an incoming call from Customer A; however, there is no evidence that said incoming call ever

occurred. Moreover, as noted above, assuming for purposes of summary judgment that the

incoming call did occur, even Mr. Preston's version of his customer interaction did not meet

Fidelity's TLO requirements for a value-added conversation. The undisputed evidence,

assuming Mr. Preston's version of his customer interaction with Customer A shows, that Mr.

Preston in fact "violated department procedures by recording a detailed customer interaction for

purposes of performance credit without actually having had the requisite degree of interaction

with the customer."[8] Thus, although Mr. Preston denies that he admitted any wrongdoing and

that he did have a TLO qualifying customer interaction, these disputed facts are not material.

Under either factual circumstance, Fidelity's evidence or Preston's testimony, Fidelity's

conclusion, and communication on the FINRA Form U5, that Mr. Preston violated the TLO

Policy and manipulated the compensation plan to benefit himself monetarily was sound and

reasonable. Thus, there is no genuine dispute of material fact about whether Fidelity was

negligent in its investigation or negligent in its statements on the Form U5. Fidelity's course of

conduct in investigating, deciding to terminate, and preparing and submitting the Form U5, were

undertaken with care. Mr. Preston has produced no evidence contrary to establish a question of

material fact to establish negligence on the part of Fidelity to defeat conditional privilege.

Accordingly, even under the lowest standard for privilege analysis, conditional privilege to be

defeated by negligence, Mr. Preston does not present evidence to support negligence on the part

of Fidelity. Therefore, regardless of whether absolute or conditional privilege applies in this

case, and absent whether conditional privilege can be defeated by negligence or malice, the

---

[8] Fidelity also argues that the statements on the From U5 are incapable of a defamatory meaning because they are true, or substantially true, even under Mr. Preston's version of events. Thus, Fidelity argues that summary judgment on the Defamation claim is also warranted on this alternate basis. The Court makes no determination as to that issue, as such is not necessary in light of the ruling herein.

minimal requirements for Fidelity's actions to satisfy and claim conditional privilege with regard to its answers on the FINRA Form U5 are met. Fidelity's conduct qualified for conditional privilege to preclude Mr. Preston's defamation claim in this case.

Viewing the record evidence in a light most favorable to Mr. Preston, the Court finds that Fidelity has demonstrated that there is no genuine dispute of material fact. Fidelity's Motion for Summary Judgment will be granted as to Mr. Preston's Defamation claim, Count II. Accordingly, judgment on Mr. Preston's Defamation claim will be entered in favor of Fidelity and against Mr. Preston.

## II. CONCLUSION

Summary judgment as a matter of law will be granted in favor of Fidelity and against Mr. Preston as to all claims. Judgment will be granted in favor of Fidelity on Mr. Preston's Age Discrimination claims, Count I (ADEA) and Count III (PHRA), and on his Defamation claim, Count II.

An appropriate order will be entered.

Dated: February _18_, 2020

Marilyn J. Horan
United States District Court Judge